UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
MORE ROOFING, INC.,

                    Plaintiff,

         -against-

WILLIAM SCRIVENS, JOHN BREGMAN,
FRANK CYRWUS, INC., and FRANK CYRWUS,

                    Defendants.

WILLIAM SCRIVENS and JOHN BREGMAN,

                    Third-Party Plaintiffs,

         -against-

BRIAN J. MORRELL, TONI JO MORRELL,
EMJACK CONSTRUCTION CORP., EMIL D.
KISZKO, JOHN/JANE DOES 1-20, and ABC
COMPANIES 1-20,

                    Third-Party Defendants.

**MEMORANDUM & ORDER**
**19-CV-4925 (NGG) (LB)**

**19-CV-4925 (NGG) (LB)**

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff More Roofing, Inc. ("MRI") brings this action against its former employees, Defendants William Scrivens and John Bregman, and against a subcontractor, Defendant Frank Cyrwus, Inc. ("FCI"), as well as Individual Defendant Frank Cyrwus (collectively, "Defendants"). As relevant here, MRI claims that Scrivens fraudulently induced MRI to hire Emjack Construction Corp. ("Emjack"), and then EMTO Construction, Inc. ("EMTO"), as the subcontractor on one of its projects. (Mot. for Partial Summary Judgment ("Mot.") (Dkt. 89-1) at 11-13; Reply (Dkt. 91).) MRI also claims that Scrivens and Bregman violated their duties of loyalty and good faith by performing work on behalf of FCI and Emjack while employed by MRI. (Mot. at 3-10.) Pending before the court is MRI's motion for partial summary judgment. (Mot.) Bregman opposes MRI's motion. (Bregman Opp. (Dkt. 90).)

1

Scrivens has failed to oppose the motion. For the reasons that follow, MRI's motion for partial summary judgment is DENIED as to its faithless servant claim against Bregman, GRANTED as to its faithless servant claim against Scrivens, and DENIED as to its fraudulent inducement claim against Scrivens.

## I.   BACKGROUND

### A.   Factual Background[1]

MRI is a roofing contractor based in New York. (MRI's Am. Compl. (Dkt. 14) ¶ 7.) Brian Morrell is the owner and President of MRI. (Pl.'s 56.1 ¶ 1.) MRI hired Scrivens to manage its New Jersey office in January 2016, and hired Bregman soon thereafter, in May 2016. (*Id.* ¶¶ 2-3, 12; Scrivens Deposition ("Scrivens Depo.") (Dkt. 89-4) 17:5, 21:24-22:2.) Scrivens acted as Bregman's supervisor, and the two worked for MRI out of its New

---

[1] The following facts are drawn from the parties' respective Local Civil Rule 56.1 statements. The relevant 56.1 statements include MRI's 56.1 Statement in support of the instant motion for partial summary judgment, (Pl.'s 56.1 (Dkt. 89-2)), and Bregman's Response to Plaintiff's 56.1 Statement, (Bregman's Response to Pl.'s 56.1 (Dkt. 90-9)). Scrivens did not submit a Rule 56.1 statement or any other opposition to MRI's motion.

Unless otherwise noted, the facts are undisputed. However, to the extent an assertion or denial of fact is not supported by admissible evidence, the court will disregard that assertion or denial. *See* E.D.N.Y. Loc. Civ. R. 56.1(d) (eff. July 1, 2024) ("Each statement by the movant or opponent under Rule 56.1(a) and (b), including each statement denying and controverting any statement of material fact, must be followed by citation to evidence that would be admissible."); *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) ("[W]here there are no citations or where the cited materials do not support the factual assertions in the [56.1] Statements, the Court is free to disregard the assertion[s]."), *abrogated on other grounds by Gross v. FBI Fin. Servs., Inc.*, 557 U.S. 167 (2009). This applies even to MRI's unopposed motion for summary judgment against Scrivens. *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (explaining that, even on an unopposed motion for summary judgment, the court "must be satisfied that the citation to evidence in the record supports the assertion").

Jersey office until the spring of 2019. (Pl.'s 56.1 ¶¶ 20-21; Scrivens Depo. 93:4-7; Bregman's Response to Pl.'s 56.1 ¶ 21.) In September of 2018, Brian Morrell instructed Scrivens and Bregman not to bid on any more jobs for MRI, and to instead focus on closing out existing projects. (Scrivens Depo. 31:9-32:22; Bregman Affidavit (Dkt. 90-5) ¶ 28.) Scrivens and Bregman assumed that Morell intended to close the New Jersey office and that they would soon be out of jobs. (Scrivens Depo. 31:22-32:1; Bregman Affidavit ¶ 28.) MRI eventually fired Scrivens and Bregman in April or May of 2019.[2] (Pl.'s 56.1 ¶ 21; Bregman's Response to Pl.'s 56.1 ¶ 21.)

Over the course of their employment, Scrivens and Bregman worked on eight construction subcontracts at issue in this litigation: four contracts between MRI and FCI (the "FCI Contracts"),

---

[2] MRI claims that Scrivens and Bregman "were terminated in May of 2019." (Pl.'s 56.1 ¶ 21.) In support of this assertion, MRI cites Scrivens's deposition, in which he testified that he "stop[ped] working" for MRI in "May of 2019." (Scrivens Depo. 21:21-23.) MRI also provides payroll summaries for Scrivens and Bregman, which show final payments in May of 2019. (Scrivens Payroll (Dkt. 89-5) at 7; Bregman Payroll (Dkt. 89-6) at 7.) Bregman, for his part, asserts that he was terminated on April 12, 2019. (Bregman's Response to Pl.'s 56.1 ¶ 21.) Bregman cites no evidence in support of his denial, although he avers in an affidavit that he worked for MRI until "April 12 2018 [sic], when [he] was informed by Brian Morel [sic] that [he] was 'laid off' and that [Morrell] was closing the New Jersey office." (Bregman Affidavit ¶ 27.)

While Scrivens's statement that he "stop[ped] working" for MRI in "May of 2019" is enough for the court to find that he was terminated in May of 2019, the court concludes that there is a genuine dispute of fact as to whether Bregman was terminated in May of 2019. (Scrivens Depo. 21:21-23.) Although Bregman's payroll summary shows a final payment in May of 2019, that does not necessarily prove that MRI fired Bregman as of that date. It is possible that MRI fired him in April 2019, as Bregman claims, and continued to pay his salary through May. As such, the court does not accept as true MRI's claim that Bregman was terminated in May of 2019, and instead assumes that Bregman was fired sometime in April or May of 2019.

and four contracts between MRI and Emjack (the "Emjack Contracts").[3] *More Roofing, Inc. v. Scrivens*, No. 19-CV-4925 (NGG) (LB), 2021 WL 413605, at *1 (E.D.N.Y. Feb. 5, 2021). In addition to these contracts, Scrivens and Bregman also performed work on behalf of FCI and Emjack unrelated to their responsibilities at MRI. (*See* Pl.'s 56.1 ¶¶ 22-137.) This conduct, along with Scrivens's behavior concerning one of the Emjack Contracts—the Camp Smith Training Site Contract—forms the basis of MRI's motion for partial summary judgment. The court discusses Scrivens and Bregman's work for FCI and Emjack before turning to the Camp Smith Training Site Contract.

### 1.  FCI

FCI is a New Jersey-based roofing contractor that was owned by Frank Cyrwus and Bozena Cyrwus. (MRI's Am. Compl. ¶ 13; Pl.'s 56.1 ¶¶ 22-23; FCI Bill of Sale (Dkt. 89-7).) Scrivens worked for FCI until an altercation with a coworker forced him to leave the company and join MRI. (Pl.'s 56.1 ¶ 26; Scrivens Depo. 23:17-23.) Even after he joined MRI, however, Scrivens continued to perform work on behalf of FCI. (Pl.'s 56.1 ¶ 27; Scrivens Depo. 24:15-26:1.) Scrivens performed this work on his own time and during MRI's business hours, and on several occasions requested that FCI-related documents be sent to MRI's New Jersey office. (Scrivens Depo. 45:22-47:1, 82:2-16.)

---

[3] The FCI Contracts include the Samuel J. Preston Elementary School Contract, the Great Neck Union Free School District Phipps Administration Building Contract, the Wappingers Falls Emergency Services Building Contract, and the Great Neck High School North Contract. (*See* MRI's Am. Compl. ¶¶ 42-104.)

The Emjack Contracts include the Harrison High School Contract, the Suffern Post Office Contract, the Elizabeth M. Baker Elementary School Contract, and the Camp Smith Training Site Contract. (*See id.* ¶¶ 117-83.) In August 2018, EMTO replaced Emjack as the subcontractor on the Camp Smith Training Site Contract. (*Id.* ¶ 168.)

Beginning in late October 2018, Scrivens helped FCI bid on several construction projects. (Scrivens Depo. 25:17-26:1, 45:3-16; FCI & Emjack Bid Bonds (Dkt. 89-8) at ECF pp. 4, 6, 12-16.) Frank Cyrwus paid Scrivens "several thousand dollars" in exchange for this work. (Scrivens Depo. 24:15-24.) Although FCI never bid on the same project as MRI, Scrivens did not disclose his work on behalf of FCI to Brian Morrell or anyone else at MRI. (*Id.* 26:17-20, 27:3-13.)

On May 3, 2019, Scrivens submitted FCI's bid application for the Valley Middle School Project. (*Id.* 138:10-21 (acknowledging the 40-page bid submitted on behalf of FCI); Valley Middle School Bid (Dkt. 89-10).) According to Scrivens, the Valley Middle School Project, which was a New Jersey State job, "required . . . New Jersey DPMC [Division of Property Management and Construction] approval to bid on it."[4] (Scrivens Depo. 139:2-3; Valley Middle School Bid at ECF p. 2 (noting the project's state plan number).) However, rather than attach proof of FCI's DPMC certification, Scrivens attached proof of MRI's DPMC certification to FCI's application. (Scrivens Depo. 138:20-139:6; Valley Middle School Bid at ECF p. 8.) Scrivens also forged Brian Morrell's signature on a document accompanying the DPMC certification, which contained affirmations that "the amount of uncompleted work on contracts is $0," and "the amount of this bid proposal . . . does not exceed my prequalification dollar limit." (Valley Middle School Bid at ECF 7; Scrivens Depo. 139:11-18.) Bregman

---

[4] Neither party explains the significance of a DPMC certification. However, MRI's DPMC certification indicates that MRI was "classifi[ed] to do State work for the [State] Department(s)." (Valley Middle School Bid at ECF p. 8.) It also lists certain approved "Trade(s) and License(s)," including general construction and roofing. (*Id.*) Thus, it appears that a DPMC certification serves to verify that a particular contractor is permitted to do certain construction work for New Jersey's various State Departments.

notarized Morrell's forged signature.[5] (Valley Middle School Bid at ECF 7.) Scrivens did not notify anyone at MRI of these dealings. (Scrivens Depo. 139:7-10.)

Scrivens also subcontracted several MRI projects to FCI. (*Id.* 28:10-14.) One such project was the Great Neck High School North Contract (the "Great Neck Contract"), in which FCI agreed

---

[5] MRI claims that Scrivens "forged" Morrell's signature and that Bregman "knowingly notarized the forged signature." (Pl.'s 56.1 ¶¶ 50-51.) In support of this assertion, MRI cites Scrivens's deposition and the Valley Middle School Bid. (*Id.*) Bregman, for his part, notes that it was "[his] job to notarize documents," and "[m]ost of the time [he] didn't read or know what was contained in the documents [he] notarized." (Bregman Affidavit ¶¶ 5-6.) Additionally, Bregman disputes that he "falsely notarized [Morrell's] signature[] without his knowledge in an attempt to deceive him." (*Id.* ¶ 19.) In support of his position, Bregman points to the affidavit of Lillian Blasso, Morrell's personal secretary, who swears that, "[t]o avoid delay and the expense of overnighting documents back and forth between [MRI's] New York and New Jersey offices," Morrell authorized Scrivens to sign his name on documents located in New Jersey, and authorized Bregman to notarize Scrivens's signing of his signature. (Blasso Affidavit (Dkt. 90-7) ¶ 5.) Bregman also cites an email where an MRI employee purportedly instructed Bregman to sign and notarize a document on behalf of Morrell, although the court cannot confirm this fact because Bregman did not include the document attachment in his submission. (MRI Email to Bregman (Dkt. 90-8).)

While Scrivens's statement that he did not inform anyone at MRI of the Valley Middle School bid is enough for the court to accept that Morrell's signature was forged, *i.e.*, signed by Scrivens without Morrell's consent, the court concludes that there is a genuine dispute of fact as to whether Bregman knowingly notarized Morrell's forged signature. Scrivens did not testify whether Bregman knew that Morrell's signature was forged. (*See* Scrivens Depo. 139:16-18.) And the sworn affidavit of Morrell's personal secretary, in which she claims that Morrell authorized Bregman to notarize Scrivens's signature of his name, suffices to create a genuine dispute as to whether Bregman knew that Scrivens was not authorized to sign Morrell's name in this particular instance. As such, the court does not accept as true MRI's statement that Bregman "knowingly notarized the forged signature" on the Valley Middle School Bid. (Pl.'s 56.1 ¶ 51.)

to provide "labor, materials, equipment and services" to MRI.[6] (Pl.'s 56.1 ¶ 56; Great Neck Contract (Dkt. 89-11).) Over the course of three weeks in August 2018, FCI performed a total of 144 hours of work for which it reportedly paid its employees $8,093.73.[7] (Pl.'s 56.1 ¶ 63; FCI Payroll Records for Great Neck Contract (Dkt. 89-12).) Of the $8,093.73 paid, Frank Cyrwus received $2,619.40. (Pl.'s 56.1 ¶ 64; FCI Payroll Records for Great Neck Contract.) From July to December of 2018, MRI paid FCI over $200,000.00 in connection with its work on the Great Neck Contract.[8] (*See* Pl.'s 56.1 ¶ 65; MRI's Payments to FCI for the Great Neck Contract (Dkt. 89-13).)

---

[6] MRI claims that the Great Neck Contract required FCI to submit payment applications to MRI "that were accompanied by Certified Payroll Reports and Partial Release of Liens." (Pl.'s 56.1 ¶ 59 (citing Great Neck Contract at 12-14).) The court found no support for this claim in the Great Neck Contract itself. (*See* Great Neck Contract at 12-14.) As such, the court does not accept this claim as true.

[7] MRI claims that, over the course of its work on the Great Neck Contract, FCI "only submitted certified payrolls for a time-period of approximately three (3) weeks." (Pl.'s 56.1 ¶ 62.) In support of this assertion, MRI cites an exhibit containing copies of FCI's payrolls for the weeks of August 5, August 12, and August 19, 2018. (FCI Payroll Records for Great Neck Contract.) While this exhibit shows that FCI submitted payrolls for three weeks in August, it does not show that FCI failed to submit payrolls for other weeks of work. As such, the court does not accept as true MRI's statement that FCI "only submitted certified payrolls for a time-period of approximately three (3) weeks." (Pl.'s 56.1 ¶ 62.)

[8] MRI claims that "Scrivens arranged for the release of payments [to FCI] totaling $262,000.00," citing an exhibit containing a copy of payments from MRI to FCI with "Great Neck HS" in the memo line. (Pl.'s 56.1 ¶ 65 (citing MRI's Payments to FCI for the Great Neck Contract).) First, the sum of payments in this exhibit do not amount to $262,000.00. (*See* MRI's Payments to FCI for the Great Neck Contract.) Second, the cited exhibit contains no indication that it was Scrivens who arranged for the release of payments to FCI. (*See id.*) As such, the court does not accept as true MRI's claims that Scrivens arranged for these payments, or that said payments totaled $262,000.00.

On July 22, 2020, over one year after their termination from MRI, Scrivens and Bregman purchased FCI from Frank and Bozena Cyrwus. (FCI Bill of Sale at ECF p. 3.)

### 2. Emjack

In October of 2018, Scrivens began preparing bid bond applications on behalf of Emjack, another construction company.[9] (Pl.'s 56.1 ¶ 66; FCI & Emjack Bid Bonds at ECF pp. 13-16 (requesting that Emjack's bonds be sent to "Bill Scrivens" at 83 Wabash Avenue in Clifton, New Jersey); Scrivens Depo. 33:3-9, 44:21-45:2 (acknowledging 83 Wabash Avenue as the location of MRI's New Jersey office).) Scrivens performed this work on his own time and during MRI's business hours, and on several occasions requested that Emjack-related documents be sent to MRI's New Jersey office. (Scrivens Depo. 34:13-35:3 (admitting that he would "occasionally" take an Emjack-related phone call during MRI's business hours, but that "very little time was used to do this"), 44:21-45:2; FCI & Emjack Bid Bonds at ECF pp. 13-16.) Emjack did not compensate Scrivens for his work, rather,

---

[9] MRI claims that both Scrivens and Bregman prepared bid bonds for Emjack. (Pl.'s 56.1 ¶ 66.) In support of this assertion, MRI cites Scrivens's deposition and copies of several bid bonds apparently filled out by Scrivens. (*Id.* (citing Scrivens Depo. 33; FCI & Emjack Bid Bonds).) Bregman denies that he prepared any bid bonds on behalf of Emjack, although he cites no evidence in support of that denial. (Bregman's Response to Pl.'s 56.1 ¶ 66.)

MRI's cited evidence does not support its assertion that Bregman assisted in the preparation of bid bonds for Emjack. Scrivens testified that he "put [Emjack] in touch with a bonding agent" and "put the clerical paperwork for the bid together." (Scrivens Depo. 33:3-7.) Scrivens did not state whether Bregman assisted in the preparation of these bid bonds. (*See id.*) Additionally, the bid bonds themselves contain no evidence of Bregman's alleged involvement. (*See* FCI & Emjack Bid Bonds.) As such, the court does not accept as true MRI's assertion that Bregman prepared bid bonds for Emjack.

Scrivens assisted Emjack "[i]n anticipation of, hopefully . . . a re-
lationship to get employment after my departure from [MRI]."
(Scrivens Depo. 34:5-12.)

In late September 2018, Scrivens, Bregman, and Emil Kiszko—
the owner of Emjack—drafted a partnership agreement whereby
the trio would become partners in an entity known as Emjack.
(Pl.'s 56.1 ¶ 81; Emjack Draft Partnership Agreement (Dkt. 89-
18).) Specifically, after Morrell instructed Scrivens and Bregman
to stop bidding on projects for MRI, Scrivens, Bregman, and
Kizko discussed "possibly going into business together for future
work after . . . [Scrivens and Bregman] left [MRI]." (Scrivens
Depo. 76:2-6.) After that conversation, Bregman drafted a part-
nership agreement. (*Id.* at 76:15-18; Pl.'s 56.1 ¶ 82; Bregman's
Response to Pl.'s 56.1 ¶ 82.) However, the parties never signed
the agreement. (Scrivens Depo. 79:5-7; *see* Emjack Draft Partner-
ship Agreement at 12.) Scrivens did not disclose these
discussions to Morrell. (Scrivens Depo. at 79:15-20.)

In October of 2018, Scrivens corresponded with Tremco Incor-
porated ("Tremco"), another roofing and building company,
regarding Emjack's application to be a part of Tremco's Approved
Roofing Applicator Program. (Pl.'s 56.1 ¶ 73.) In particular, on
October 26, 2018, a representative of Tremco sent Scrivens, via
his MRI email address,[10] the application paperwork for Tremco's
Approved Contractor Program. (October 2018 Email Exchange
Between Scrivens, Bregman, and Tremco (Dkt. 89-16); Tremco
Application Paperwork (Dkt. 89-15).) Three days later, Scrivens
forwarded the application paperwork to Bregman, also at his
MRI email address. (October 2018 Email Exchange Between
Scrivens, Bregman, and Tremco.)

---

[10] Scrivens testified at his deposition that his MRI email address is "the
email address I use for everything," and "I don't have a personal email."
(Scrivens Depo. 60:16-23.)

On November 1, 2018, Emjack registered as an LLC with the New Jersey Department of the Treasury. (Emjack Certificate of Formation (Dkt. 89-17).) The Certificate of Formation listed Bregman's home address as Emjack's business address. (*Id.*; Scrivens Depo. 72:2-11; Pl.'s 56.1 ¶ 80; Bregman's Response to Pl.'s 56.1 ¶ 80.)

On December 26, 2018, Emjack and Versico Roofing Systems ("Versico") entered into a Contractor Agreement whereby Versico granted Emjack the right to purchase and install Versico's roofing products. (Versico Contract (Dkt. 89-14) at 1-2.) The Contractor Agreement listed Scrivens as Emjack's "Company Contact," and included Scrivens's MRI email address with his contact information. (*Id.* at 1.) Scrivens helped Kiszko fill out the Versico Contractor Agreement. (Scrivens Depo. 36:15-16, 58:8-16; Pl.'s 56.1 ¶ 70.)

On March 19, 2019, MRI submitted a bid to Jennings Co., Inc. ("Jennings") in connection with the Parsons Memorial Elementary School Roofing Project (the "Parsons Project"). (Pl.'s 56.1 ¶¶ 85, 87; Bregman's Response to Pl.'s 56.1 ¶¶ 85, 87.) Bregman prepared and submitted MRI's bid with Brian Morrell's permission. (Pl.'s 56.1 ¶ 86; Bregman Affidavit ¶ 35; March 2019 Emails (Dkt. 89-21) at ECF p. 2 (March 15, 2019 email from Jennings to Bregman containing the Parsons Project plans).) Jennings awarded the subcontract to MRI; however, MRI ultimately refused the job under "awkward" circumstances. (Bregman's Response to Pl.'s 56.1 ¶ 87; Bregman Affidavit ¶ 36; Scrivens Depo. 109:12-13.) According to Bregman, after Jennings awarded the subcontract to MRI, Jennings "asked for a meeting to go over the scope of work and sign the contract." (Bregman Affidavit ¶ 36.) Morrell instructed Bregman to attend the meeting and call him from the parking lot beforehand. (*Id.*) However, when Bregman arrived and called Morrell as instructed, Morrell instructed him to go in and refuse the job. (*Id.*) Bregman "did

what [he] was told and refused the job." (*Id.*) Bregman also told Jennings that "the subcontractor that did most of the work in Harrison for [MRI] was Emjack and that they could award them the job if they wanted to." (*Id.*) Bregman "ha[s] no idea" what motivated Morrell to bid on and then refuse the Parsons Project, "other than a desire to make a fool out of [Bregman]." (*Id.* ¶¶ 36-37.)

Jennings ultimately awarded the Parsons Project subcontract to Emjack. (Bregman Affidavit ¶ 36; Pl.'s 56.1 ¶ 87; *see also* Unexecuted Parsons Project Contract (Dkt. 89-20).) An unexecuted copy of the contract between Jennings and Emjack[11] listed Bregman as Emjack's representative and Bregman's home address as Emjack's business address. (*Id.* at 17; Pl.'s 56.1 ¶ 80; Bregman's Response to Pl.'s 56.1 ¶ 80.) It also designated Bregman as the officer responsible for certifying Emjack's payroll reports. (*See* Unexecuted Parsons Project Contract at 17.) While Scrivens "helped" Emjack "get" the Parsons Project job, it is unclear what that help entailed, or whether Scrivens rendered this help before or after MRI refused the job.[12] (Scrivens Depo. 105:18-106:15.) It is also unclear whether Scrivens notified Morrell of his involvement with the Parsons Project. (*Id.* 105:23-106:1 ("Q Did you tell Brian [Morrell] that you helped Emjack get [the Parsons]

---

[11] Neither MRI nor Bregman submitted a copy of the *executed* contract between Jennings and Emjack.

[12] MRI claims that Scrivens prepared Emjack's Parsons Project bid. (Pl.'s 56.1 ¶ 88.) In support of this assertion, MRI cites Scrivens's deposition. (*Id.* (citing Scrivens Depo. 105-106).) However, Scrivens did not testify that he prepared Emjack's Parsons Project bid. Rather, counsel for MRI asked whether Scrivens "compile[d] a bid proposal for Emjack to get that job," and Scrivens replied "No." (Scrivens Depo. 106:2-4.) Scrivens testified that Bregman prepared the bid on Emjack's behalf. (*Id.* 106:5-6.)

While it is clear that Scrivens and Bregman were involved in Emjack's Parsons Project bid in some capacity, there is insufficient record evidence to support MRI's claim that Scrivens actually prepared Emjack's bid. As such, the court does not accept this claim as true.

job? A I don't recall.").) In any event, in late March 2019, Scrivens emailed Jennings on behalf of Emjack "right around lunchtime" during MRI's business hours. (March 2019 Emails at ECF p. 3; Scrivens Depo. 112:11-113:9; Pl.'s 56.1 ¶ 94.) Scrivens copied Bregman on that email. (March 2019 Emails at ECF p. 3.)

In May of 2019, Scrivens prepared Emjack's bid bond application for the Bolan Administration Building Roofing Project (the "Bolan Project"). (Scrivens Depo. 41:1-42:18; FCI & Emjack Bid Bonds at ECF p. 2.) On May 16, 2019, Scrivens met with the architect for the Bolan Project, CPL Architecture, at the Bolan Project site. (Scrivens Depo. 126:4-128:23; Scrivens Letter to CPL Architecture (Dkt. 89-22).) Scrivens testified that he was "still working for [MRI]" at the time of this meeting, but "[a]t that point we were basically . . . not working anymore for [MRI]. . . . [w]e were just cleaning up and . . . closing out the building." (Scrivens Depo. 128:1-23.) An undated letter signed by Scrivens and addressed to CPL Architecture confirmed that "[a]ll completion of the work will be personally supervised by either John Bregman or [Scrivens]." (Scrivens Letter to CPL Architecture.) The letter also listed Bregman's home address as Emjack's business address. (*Id.*)

Finally, also in May of 2019, Emjack entered into a contract with Lukas Marek Construction ("Marek") whereby Marek agreed to provide labor for one of Emjack's roofing projects. (Marek Contract (Dkt. 89-23).) Marek had previously worked as a subcontractor for MRI. (Scrivens Depo. 122:5-7.) Scrivens signed the contract on behalf of Emjack on May 8, 2019—while he was still employed by MRI. (Marek Contract; Scrivens Depo. 123:10-21.) Scrivens did not inform Morrell of these dealings. (Scrivens Depo. 122:9-12.)

> 3. The Camp Smith Training Site Contract

One of the Emjack Contracts at issue in this litigation is the Camp Smith Training Site Contract (the "Camp Smith Contract" or

"Camp Smith Project"). Camp Smith is a military training site in New York owned by the New York State Office of General Services ("OGS"). (*See* Camp Smith Contract (Dkt. 89-24) at ECF p. 2.) Sometime in 2018, OGS hired MRI as the contractor for a roof replacement project at Camp Smith. (*Id.*) On June 5, 2018, MRI retained Emjack as a subcontractor to "provide all labor and safety equipment necessary" for the Camp Smith Project.[13] (Pl.'s 56.1 ¶ 105; Camp Smith Contract at ECF pp. 2, 12.)

The Camp Smith Contract required Emjack to submit "applications for payment"—*i.e.*, invoices—to MRI, which would then submit corresponding invoices to OGS. (Camp Smith Contract at ECF pp. 1, 13.) The Contract required each invoice to be "accompanied by [a] Certified Payroll Report and [a] Partial Release of Lien for the same period." (*Id.* at ECF p. 13.) However, rather than draft and submit its own invoices to MRI, Kiszko and Scrivens would meet and "come up with" an agreed-upon amount to charge MRI. (Scrivens Depo. 136:14-21.) Scrivens

---

[13] MRI claims that Scrivens and Bregman retained Emjack as the subcontractor on the Camp Smith Project, and that Scrivens signed Morrell's name on the Camp Smith Contract. (Pl.'s 56.1 ¶ 105.) MRI cites the Camp Smith Contract in support of these assertions. (*Id.*) Bregman does not dispute that he and Scrivens retained Emjack for the Camp Smith Project, or that Scrivens signed Morrell's name on the contract; however, Bregman claims that this was "strictly within Mr. Scrivens['s] authority [and] Brian Morrell was aware of the use of every subcontractor on every job, including camp smith." (Bregman's Response to Pl.'s 56.1 ¶ 105.) Bregman cites no evidence in support of his assertion.

The Camp Smith Contract does not indicate whether Scrivens and Bregman retained Emjack, or whether Scrivens signed Morrell's signature on his behalf. (*See* Camp Smith Contract at ECF p. 20.) And Bregman provides no evidentiary support for his version of events. (*See* Bregman's Response to Pl.'s 56.1 ¶ 105.) As such, the court does not accept as true MRI's claims that Scrivens and Bregman retained Emjack as the subcontractor on the Camp Smith Project, or that Scrivens signed Morrell's name on the Camp Smith Contract.

13

would then prepare Emjack's invoice and submit it to MRI for processing. (*Id.* 136:10-21.)

On July 31, 2018, OGS sent MRI a letter, addressed to Scrivens, informing MRI that "unapproved nails" had been used on the Camp Smith Project, and demanding that MRI "remove all non-approved nails . . . and submit the recommended screws to be used."[14] (Letter Dated July 31, 2018 at 1.) The letter further provided: "At no time was work stopped by the Director's Representative or a stop work order issued, More Roofing is directed to return to site and proceed with the contract work."[15] (*Id.* at 2.)

On August 10, 2018, Scrivens, on behalf of MRI, executed a Rider to the Camp Smith Contract replacing Emjack with EMTO as the subcontractor on the Project. (Camp Smith Rider (Dkt. 89-26) (noting that "[a]ll other terms [and] conditions of the contract

---

[14] MRI claims that the July 31, 2018 letter "confirmed that Emjack had used non-approved nails for its work on the project" and "directed that [MRI] and Emjack remove all non-approved nails." (Pl.'s 56.1 ¶¶ 114-115 (citing Letter Dated July 31, 2018 (Dkt. 89-25).) However, the July 31, 2018 letter does not state whether Emjack used the non-approved nails, nor does it specifically instruct Emjack to remove those nails. (*See* Letter Dated July 31, 2018.) In fact, the letter does not mention Emjack at all. (*See id.*) While one might assume that Emjack used the non-approved nails, given that MRI hired Emjack to provide labor for the Project, this letter does not necessarily establish that fact. Moreover, while MRI hired Emjack to provide labor and safety equipment, it did not hire Emjack to provide *materials* like nails or screws. (*See* Camp Smith Contract at ECF p. 12.) Ultimately, whether Emjack used the nails and was instructed to remove them is of no consequence in determining the instant motion. Therefore, the court treats these alleged facts as disputed.

[15] MRI claims that the July 31, 2018 letter "confirms that Emjack had abandoned the project and More was directed to have labor return to the worksite." (Pl.'s 56.1 ¶ 116 (citing Letter Dated July 31, 2018.) While the letter indicates that work stopped on the Camp Smith Project, it does not confirm that *Emjack* abandoned the project. (*See* Letter Dated July 31, 2018.) As such, the court does not accept this claim as true.

14

remain unchanged").) EMTO began work on the Camp Smith Project on August 13, 2018, after Emjack's insurance had lapsed. (October 2018 Email Chain (Dkt. 89-28) at ECF p. 2.). Between August 16 and November 7, 2018, MRI paid EMTO over $100,000.00 for its work on the Project.[16] (MRI Checks to EMTO (Dkt. 89-29) at ECF pp. 3-9.)

---

[16] MRI claims that "Scrivens authorized [MRI to] make payments to EMTO in an amount not less than $189,300.00." (Pl.'s 56.1 ¶ 122.) In support of this assertion, MRI cites an exhibit containing a table of "All Transactions" between MRI and EMTO, and a series of checks made out from MRI to, among other entities, EMTO. (*See* MRI Checks to EMTO.) First, while the amounts in the table add up to approximately $189,300.00, it is unclear whether the listed amounts are charges or deposits to MRI's account. (*Id.* at ECF p. 2 (classifying transactions as "Bill," "Bill Pmt-Check," or "Check").) And the copied checks only add up to approximately $107,000.00. (*Id.* at ECF pp. 3-9.) Second, neither the table nor the checks contain any indication that Scrivens authorized these payments to EMTO. (*See generally id.*) As such, the court does not accept as true MRI's assertion that Scrivens authorized $189,300.00 in payments to EMTO.

MRI also claims that "Scrivens released the payments even though EMTO did not execute Partial Release of Lien as required by the terms and conditions of the Contract." (Pl.'s 56.1 ¶ 123.) In support of this assertion, MRI cites the Camp Smith Contract and a copy of "the unsigned AIA Contractor's Affidavit of Payment of Debts and Claims issued to EMTO Construction in connection with the Camp Smith project." (Eden Affidavit (Dkt. 89-3) ¶ 30; *see also* Camp Smith Contract; EMTO Affidavit of Payment of Debts and Claims (Dkt. 89-30).) Neither of these documents contain any indication that Scrivens authorized the payments to EMTO. (*See* Camp Smith Contract; EMTO Affidavit of Payment of Debts and Claims.) Additionally, while the Camp Smith Contract required each invoice to be "accompanied by [a] Certified Payroll Report and [a] Partial Release of Lien for the same period," the Affidavit of Payment of Debts and Claims does not establish or indicate that EMTO failed to execute and submit those documents. (Camp Smith Contract at ECF p. 13; EMTO Affidavit of Payment of Debts and Claims.) As such, the court does not accept as true MRI's assertion that Scrivens authorized the payments to EMTO, or that EMTO "did not execute [a] Partial Release of Lien as required by the terms and conditions of the Contract." (Pl.'s 56.1 ¶ 123.)

On October 2, 2018, OGS informed Bregman via email that "the work period of your payment 1 is 9/11/18 but we only have certified payrolls up to 8/31/18," and "[t]o process your payment [OGS] need[s] certified payrolls past 9/11." (Email Dated October 2, 2018 (Dkt. 89-27).) OGS asked Bregman to "email those [payrolls] . . . so [it could] get the payment moved along." (*Id.*)

On October 30, 2018, OGS notified Scrivens that MRI had violated its contractual obligation to "submit [to OGS] any subcontractors [MRI] plan[s] to use for a project <u>prior</u> to them arriving on site." (October 2018 Email Chain at ECF pp. 3-4 (bold and italic emphases omitted).) OGS further advised that "Emjack and EMTO remain disapproved pending receipt and review of requested documentation and information," and neither Emjack nor EMTO could enter the job site "until their issues [were] resolved." (*Id.* at ECF p. 4.) Later that same day, Bregman created an online User Account for Scrivens with the Office of the New York State Comptroller (the "State Comptroller"). (Email Dated October 30, 2018 (Dkt. 89-31).) The confirmation email notified Scrivens, via his MRI email address, that "A User Account has been created for you by John Bregman of EMTO CONSTRUCTION INC to allow you to access the . . . State Comptroller's Online Services." (*Id.*)

On November 8, 2018, the New York State Department of Labor (the "DOL") sent a request for information to MRI's New Jersey office in connection with the Camp Smith Project. (DOL Request for Info. (Dkt. 89-32) at ECF p. 2.) The DOL requested, among other things, a completed "Contractor Profile," daily time records, and certified payrolls for the entire Project. (*Id.*) Although someone filled out MRI's Contractor Profile, it is unclear whether

MRI ultimately submitted the Profile—or any of the remaining documentation—to the DOL as requested.[17] (*Id.* at ECF pp. 4-9.)

On May 30, 2019, the DOL issued MRI a notice of withholding in the amount of $263,895.09 in connection with EMTO's alleged failure to pay prevailing wages to its workers on the Camp Smith Project. (EMTO Notices of Withholding (Dkt. 89-34) at ECF p. 2; Notice of Hearing Dated April 15, 2024 (Dkt. 89-37) at ECF p. 2.) Thereafter, on July 1, 2019, the State Comptroller notified MRI that it was withholding $67,395.87 in payments related to the Camp Smith Project. (EMTO Notices of Withholding at ECF p. 3; Notice of Hearing Dated April 15, 2024 ¶ 14.) The DOL held a hearing regarding EMTO's alleged failure to pay prevailing wages in October 2024; however, the outcome of that hearing is unknown to the court. (DOL Notice of Hearing (Dkt. 89-37).) As of October 2024, $67,395.87 remains withheld from MRI. (Pl.'s 56.1 ¶ 137.)

On August 21, 2019, the DOL issued MRI a notice of withholding in the amount of $22,016.75 in connection with Emjack's alleged failure to pay prevailing wages to its workers on the Camp Smith Project. (Emjack Notice of Withholding (Dkt. 89-33) at ECF p. 2; DOL, MRI, and Emjack Stipulation (Dkt. 89-35) at ECF p. 7.) Emjack ultimately settled the $22,016.75 notice of withholding via stipulation with the DOL dated March 27, 2024. (DOL Stipulation (Dkt. 89-25).) Around the same time, the DOL issued a

---

[17] MRI claims that Scrivens filled out MRI's Contractor Profile, that he "did not advise Brian Morrell of the request [for information]," and that he "designated in the [Contractor Profile] only his contact information." (Pl.'s 56.1 ¶¶ 127-29 (citing DOL Request for Info).) While the Contractor Profile does list Scrivens's contact information, it contains no indication that *Scrivens* filled out the Profile, or that he neglected to advise Morrell of the DOL's request for information. (*See generally* DOL Request for Info.) As such, the court does not accept as true MRI's claims that Scrivens filled out MRI's Contractor Profile or that he failed to advise Brian Morrell of the request for information.

Notice to Release Payment in the amount of $22,016.75 to MRI. (Notice to Release Payment (Dkt. 89-34).) MRI apparently concedes that there are no outstanding notices of withholding as to Emjack. (*See* Pl.'s 56.1 ¶ 132; Mot. at 12 ("Emjack's alleged prevailing wage violations . . . were . . . resolved by a settlement agreement reached by and between Emjack and the [DOL].").)

### B.    Procedural History

MRI filed the instant lawsuit against Scrivens, Bregman, FCI, and Frank Cyrwus on August 28, 2019. (MRI's Compl. (Dkt. 1).) MRI filed the operative Amended Complaint on December 11, 2019, alleging 15 causes of action against the same defendants.[18] (*See* MRI's Am. Compl.) For each of the four FCI Contracts, MRI claims fraud in the inducement against all Defendants, and breach of contract against FCI. (*Id.* ¶¶ 196-278.) For each of the four Emjack Contracts, MRI claims fraud in the inducement against Scrivens and Bregman. (*Id.* ¶¶ 279-328.) MRI also alleges breaches of the duty of loyalty and violations of the faithful servant doctrine against Scrivens and Bregman. (*Id.* ¶¶ 329-352.)

Scrivens, Bregman, and Cyrwus answered MRI's Amended Complaint on November 9, 2021, asserting several counterclaims against MRI and a third-party complaint against Brian and Toni Jo Morrell, Emjack, Kiszko, John/Jane Does 1-20, and ABC Companies 1-20. (*See* Third-Party Compl. (Dkt. 23).) Scrivens, Bregman, and Cyrwus filed their amended answers, counterclaims, and third-party complaint on March 4, 2022. (*See* Am. Third-Party Compl. (Dkt. 36); *see also* Emjack Answer to Am. Third-Party Compl. (Dkt. 37); Kiszko Answer to Am. Third-Party Compl. (Dkt. 38).)

---

[18] Although MRI refers to "Defendant Emjack Construction LLC" in its Amended Complaint, the Amended Complaint does not name Emjack or EMTO as Defendants. (*See* Amend. Compl. ¶¶ 7-20, 108.)

On March 12, 2020, FCI filed a motion to, among other things, compel arbitration. (Mot. to Compel Arbitration (Dkt. 16).) On February 5, 2021, the court granted FCI's motion and stayed the proceedings as to FCI pending the resolution of arbitration. (Memorandum & Order Granting Mot. to Compel Arbitration (Dkt. 17); *see also* Mot. for Reconsideration (Dkt. 18); Order Denying Mot. for Reconsideration (Dkt. 20).)

In February 2024, MRI notified the court of its intention to move for partial summary judgment against Scrivens and Bregman, and Emjack and Kiszko notified the court of their intention to seek summary judgment and Rule 11 sanctions against Scrivens and Bregman regarding their Amended Third-Party Complaint. (*See* Emjack's Request for Pre-Motion Conference (Dkt. 74); MRI's Request for Pre-Motion Conference (Dkt. 75).) The court set a joint briefing schedule with both fully-briefed motions due by October 4, 2024. (Min Entry Dated 5/20/2024.)

At the outset of this case, counsel Steven Bialkowski appeared on behalf of all Defendants, including Scrivens and Bregman. (Bialkowski Notice of Appearance ("NOA") (Dkt. 7).) In September 2023, however, Bialkowski withdrew as counsel for the Defendants due to an apparent conflict of interest which arose at Scrivens's deposition, where Scrivens "testified in such a way as to create a conflict between himself and the other defendants." (Bialkowski Cert. (Dkt. 58-1) ¶ 2; Text Order Dated 9/20/2023 (granting motion to withdraw).) Paul Greenfield then appeared on behalf of Bregman, and Gil Santamarina appeared on behalf of Scrivens. (Greenfield NOA (Dkt. 65); Santamarina NOA (Dkt. 70).) On July 1, 2024, just before the start of motion practice, Scrivens discharged Santamarina and elected to proceed *pro se*. (Santamarina Discharge (Dkt. 78); Min Entry Dated 5/20/2024 (setting briefing schedule with opening motions due on July 22, 2024).)

MRI filed the instant motion for partial summary judgment on October 3, 2024.[19] (*See generally* Mot.)

## II. LEGAL STANDARD

Summary judgment is warranted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is material . . . if it might affect the outcome of the suit under the governing law." *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000).[20] A "genuine" issue of fact "is one where the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Khotovitskaya v. Shimunov*, 723 F. Supp. 3d 235, 241 (E.D.N.Y. 2024).

"It is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). As such, Rule 56.1 of the Local Civil Rules of the Eastern District of New York provides that a motion for summary judgment "must be accompanied by a separate, short, and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." E.D.N.Y. Loc. Civ. R. 56.1(a).[21] The opposing party may then submit its opposition, which must include correspondingly numbered paragraphs "admitting or denying, and otherwise responding to, each numbered paragraph in the statement of the moving party, and if necessary,

---

[19] Emjack and Kiszko filed their fully-briefed motion for summary judgment and Rule 11 sanctions on October 1, 2024. (*See* Emjack Mot. (Dkt. 81).) The court adjudicates that motion in a separate Memorandum and Order.

[20] When quoting cases, and unless otherwise noted, all citations and quotation marks are omitted, and all alterations are adopted.

[21] Citations to the E.D.N.Y. Local Civil Rules are to the July 1, 2024 edition, which were in effect at the time MRI filed its motion for summary judgment.

additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." E.D.N.Y. Loc. Civ. R. 56.1(b); *see also Ethelberth v. Choice Sec. Co.*, 91 F. Supp. 3d 339, 349 (E.D.N.Y. 2015) (explaining that the opposing party "must identify specific facts and affirmative evidence that contradict those offered by the moving party to demonstrate that there is a genuine issue for trial").

Critically, a genuine issue of material fact "cannot be established by conclusory allegations, conjecture, and speculation." *Khotovitskaya*, 723 F. Supp. 3d at 241; *Allstate Ins. Co. v. Longwell*, 735 F. Supp. 1187, 1193 n.2 (S.D.N.Y. 1990) ("Bare denials, without more, will not create a genuine issue of fact."). Instead, "[e]ach statement by the movant or opponent under Rule 56.1(a) and (b), including each statement denying and controverting any statement of material fact, *must* be followed by citation to evidence that would be admissible and set forth as required by Fed. R. Civ. P. 56(c)." E.D.N.Y. Loc. Civ. R. 56.1(d) (emphasis added). Federal Rule of Civil Procedure 56(c), in turn, provides that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion" by (A) "citing to particular parts of materials in the record"[22] or (B) "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). If a party fails to properly support an assertion or denial of fact as required by Rule 56(c), the court may, among other things, "consider the fact undisputed," "grant summary judgment if the motion and supporting

---

[22] These may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, [and] interrogatory answers." Fed. R. Civ. P. 56(c)(1)(A).

21

materials . . . show that the movant is entitled to it," or "issue any other appropriate order." Fed. R. Civ. P. 56(e)(2)-(4).

In deciding a motion for summary judgment, the court must "construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *ING Bank N.V. v. M/V TEMARA, IMO No. 9333929*, 892 F.3d 511, 518 (2d Cir. 2018). "However, in determining what may reasonably be inferred" from the evidence in the record, the court will not afford the non-movant "the benefit of unreasonable inferences, or inferences at war with undisputed facts." *Cnty. of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990); *Contemp. Mission, Inc. v. U.S. Postal Serv.*, 648 F.2d 97, 107 (2d Cir. 1981) ("[I]t is clear that a plaintiff cannot defeat a motion for summary judgment by merely restating the conclusory allegations contained in his complaint[.]")

If a party fails to oppose a motion for summary judgment, the court may "grant summary judgment *if the motion and supporting materials . . . show that the movant is entitled to it.*" Fed. R. Civ. P. 56(e)(3) (emphasis added). However, "[a] non-response does not risk a default judgment." *Jackson v. Fed. Express*, 766 F.3d 189, 194 (2d Cir. 2014). Rather, before the court may enter summary judgment, it must "ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production even if the statement is unopposed." *Id.* (citing *Vt. Teddy Bear*, 373 F.3d at 244 (explaining that the court "may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement"). "In doing so, the court may rely on other evidence in the record even if uncited." *Id* (citing Fed. R. Civ. P. 56(c)(3)). "If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied *even if no opposing evidentiary matter is*

presented." *Vt. Teddy Bear*, 373 F.3d at 244 (emphasis in original). Additionally, even where the movant meets its burden of production, the court may deny summary judgment if "the undisputed facts fail to show that the moving party is entitled to judgment as a matter of law." *Id.*

## III. DISCUSSION

MRI seeks summary judgment on three counts of its Amended Complaint: Count 12, alleging fraudulent inducement as to Scrivens with respect to the Camp Smith Contract; Count 14, alleging faithless servant as to Scrivens; and Count 15, alleging faithless servant as to Bregman. (Mot. at 3, 11.) Bregman opposes MRI's motion. (*See* Bregman Opp.) Scrivens did not submit an opposition. The court addresses a choice of law issue before turning to the faithless servant and fraudulent inducement claims in turn.

### A. Choice of Law

MRI and Bregman assume that New York law governs the claims at issue in MRI's motion for partial summary judgment. (Mot. at 3-11; Bregman Opp. at ECF pp. 3-4.) However, Scrivens and Bregman's alleged acts of faithless service occurred primarily in New Jersey. And no party has submitted a copy of their employment contracts, if such documents exist, which might contain choice of law provisions. Additionally, as to the fraudulent inducement claim, the Camp Smith Contract contains no choice of law provision. (*See* Camp Smith Contract.) Nor is it clear whether MRI and Emjack signed the Camp Smith Contract in New York or New Jersey. (*See id.*) Thus, there is a question whether New York or New Jersey law applies to MRI's faithless servant and fraudulent inducement claims.

1.  Applicable Law

"A federal court sitting in diversity . . . must apply the choice of law rules of the forum state." *Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 157 (2d Cir. 2012). "Under New York choice-of-law rules, the first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved." *Id.* If there is no conflict, and New York is among the relevant jurisdictions, "the court may simply apply New York law." *Id.* (explaining that a choice of law analysis "need not be performed unless there is an 'actual conflict' between the applicable rules of two relevant jurisdictions").

Additionally, where the parties agree to the application of the forum law, "their consent concludes the choice of law inquiry." *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997). Thus, if "[t]he parties' briefs assume that New York substantive law governs the issues . . . such implied consent is, of course, sufficient to establish the applicable choice of law." *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009).

2.  Application

The court concludes that New York law applies to MRI's faithless servant and fraudulent inducement claims.

As to MRI's claims against Bregman, both MRI and Bregman assume that New York law applies. (Mot. at 3; Bregman Opp. at ECF pp. 3-4.) Their apparent consent "concludes the choice of law inquiry," and the court applies New York substantive law to MRI's faithless servant claim against Bregman. *Am. Fuel Corp.*, 122 F.3d at 134.

Regarding MRI's claims against Scrivens, because Scrivens did not submit a brief in opposition, the court cannot presume his consent to the application of New York law. Nevertheless, the court concludes that there is no actual conflict between New York

and New Jersey law on the topics of the faithless servant or fraudulent inducement doctrines.

As to the faithless servant doctrine, under New York law, an employee or agent is obligated "to be loyal to his employer and is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties." *W. Elec. Co. v. Brenner*, 41 N.Y.2d 291, 295 (N.Y. 1977); *Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 200 (2d Cir. 2003) (noting that the faithless servant doctrine "is grounded in the law of agency"). "A person who is found to be faithless in his performance of services is generally liable for all compensation from the date of the breach," regardless of whether the employer suffered any damages. *Carco Grp., Inc. v. Maconachy*, 383 F. App'x 73, 76 (2d Cir. 2010) (summary order) (citing *Phansalkar*, 344 F.3d at 200). Similarly, under New Jersey law, "an employer may seek disgorgement of a disloyal employee's compensation as a remedy for the breach of the duty of loyalty, with or without a finding of economic loss." *Kaye v. Rosefielde*, 223 N.J. 218, 236 (N.J. 2015). New Jersey courts "apply a duty of loyalty analysis to determine whether one acted as a faithless servant." *Tiger Supplies Inc. v. MAV Assocs. LLC*, No. 20-15566, 2022 WL 1830796, at *10 (D.N.J. Jun. 3, 2022). The plaintiff must prove: "(1) the existence of an employer-employee relationship, (2) breach of the duty of loyalty, and (3) resulting harm to the plaintiff." *Id.* While New Jersey courts analyze faithless servant claims under a breach of duty framework, and New York courts apply principles of agency, this appears to be a distinction without a difference in this case. Because both jurisdictions recognize that an employer may seek forfeiture of a disloyal employee's wages, the court concludes there is no actual conflict between New York and New Jersey law in this context. As such, the court applies New York law to MRI's faithless servant claim against Scrivens.

As to fraudulent inducement, to state a claim for fraudulent inducement under New York law, a plaintiff must allege: "(1) a material misrepresentation or omission that induced the party to sign the contract; (2) scienter; (3) reliance; and (4) injury." *City Calibration Ctrs. Inc. v. Health Consultants Inc.*, 727 F. Supp. 3d 332, 361 (E.D.N.Y. 2024). New Jersey courts apply a virtually identical test. *See, e.g.*, *CDK Glob., LLC v. Tulley Auto. Grp., Inc.*, 489 F. Supp. 3d 282, 303-04 (D.N.J. 2020) (listing elements of fraudulent inducement under New Jersey law as "(1) a material representation of a presently existing or past fact; (2) made with knowledge of its falsity; (3) with the intention that the other party rely thereon; (4) resulting in reliance by that party; (5) to his detriment"). Additionally, in both New York and New Jersey, a fraudulent inducement claim cannot be used to merely restate a breach of contract claim; rather, the alleged fraud must be "extraneous" to the contract. *See FPP, LLC v. Xaxis US, LLC*, 764 F. App'x 92, 94 (2d Cir. 2019) (summary order); *Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co.*, 226 F. Supp. 2d 557, 563-64 (D.N.J. 2002). Thus, the court concludes there is no actual conflict between New York and New Jersey law; as such, New York law applies to MRI's fraudulent inducement claim against Scrivens.

## B. Faithless Servant

### 1. Applicable Law

Under New York law, the faithless servant doctrine provides that an employee or agent is obligated "to be loyal to his employer and is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties." *W. Elec.*, 41 N.Y.2d at 295; *Phansalkar*, 344 F.3d at 200. This duty "is not dependent upon an express contractual relationship, but exists even where the employment relationship is at-will." *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp.

2d 489, 521 (S.D.N.Y. 2011). In general, "[a] person who is found to be faithless in his performance of services is generally liable for all compensation from the date of the breach," regardless of whether the employer suffered any damages. *Carco Grp.*, 383 F. App'x at 76 (citing *Phansalkar*, 344 F.3d at 200).

"New York courts have used two different standards to determine whether an employee's misbehavior warrants forfeiture." *Phansalkar*, 344 F.3d at 201. Under the first standard, articulated in *Turner v. Konwenhoven*, an employee forfeits promised compensation when the "misconduct and unfaithfulness . . . substantially violates the contract of service." 100 N.Y. 115, 120 (N.Y. 1885). New York courts have found disloyalty to be insubstantial only "where the disloyalty consisted of a single act, or where the employer knew of and tolerated the behavior." *Phansalkar*, 344 F.3d at 201-02, 202 n.13 (collecting cases). Under the second standard, articulated in *Murray v. Beard*, an employee forfeits promised compensation "if he acts adversely to his employer in any part of the transaction, or omits to disclose any interest which would naturally influence his conduct in dealing with the subject of the employment." 102 N.Y. 505, 508 (N.Y. 1886). This standard "suggests that misconduct by an employee that rises to the level of a breach of a duty of loyalty or good faith is sufficient to warrant forfeiture [of compensation]." *Phansalkar*, 344 F.3d at 202; *see also Feiger v. Iral Jewelry, Ltd.*, 41 N.Y.2d 928, 929 (N.Y. 1977) (no forfeiture where employee "was not guilty of any breach of fidelity").

New York courts "have not reconciled any differences" between the two standards, "or defined the circumstances, if any, in which one standard should apply rather than the other." *Phansalkar*, 344 F.3d at 202; *see also Yukos Capital S.A.R.L. v. Feldman*, 977 F.3d 216, 237-38 (2d Cir. 2020). Courts typically assess an employee's behavior under both standards. *See, e.g., id.* at 238-39 (concluding that employee's behavior warrants forfeiture under

27

both standards); *Carco Grp., Inc. v. Maconachy,* 644 F. Supp. 2d 218, 243 (E.D.N.Y. 2009) (same), *aff'd in part and rev'd in part on other grounds,* 383 F. App'x 73 (2d Cir. 2010); *Stanley v. Skowron,* 989 F. Supp. 2d 356, 361 (S.D.N.Y. 2013) (same).

In this case, the court applies the *Murray,* rather than the *Turner* standard to assess Scrivens's and Bregman's conduct. The *Turner* standard asks whether an employee's misconduct "substantially violates the contract of service," *Turner,* 100 N.Y. at 120; however, in this case, the parties have not submitted a copy of Scrivens's or Bregman's employment contracts, if such documents even exist. As such, it would be difficult, if not impossible, to assess Scrivens's and Bregman's behavior against nonexistent employment contracts or contracts to which the court does not have access. For that reason, the court applies the *Murray* standard, which is grounded not in an analysis of the employment contract but in the general duties of loyalty and good faith owed by an employee to their employer. *See Murray,* 102 N.Y. at 508; *see also Yukos Capital,* 977 F.3d at 238 (concluding that it was not plain error for the district court to instruct the jury on the *Turner* standard rather than the *Murray* standard because the question of which standard applies and when "remains open").

### 2. Application

MRI alleges violations of the faithless servant doctrine against Scrivens and Bregman. The court addresses MRI's claims against Bregman before turning to its claims as to Scrivens. Additionally, the court limits its analysis to the facts set forth above, *i.e.,* to those factual assertions and denials properly supported by "citation to evidence that would be admissible and set forth as required by Fed. R. Civ. P. 56(c)." E.D.N.Y. Loc. Civ. R. 56.1(d).

### a. Bregman

MRI provides evidentiary support for two alleged acts of faithless service on the part of Bregman: (1) Bregman's notarization of

Morrell's signature on FCI's Valley Middle School Project bid; and (2) Bregman's involvement with Emjack in the fall of 2018 and spring of 2019. (*See* Mot. at 6-10.) For the reasons set forth below, these circumstances do not establish faithless service under the *Murray* standard.

As to the Valley Middle School Project, it is undisputed that Scrivens prepared FCI's bid application for Project, appended proof of MRI's DPMC certification to FCI's bid application, and forged Morrell's signature on a document accompanying the DPMC certification. (*See* Scrivens Depo. 139:2-18.) It is also undisputed that Bregman notarized Morrell's forged signature. (Bregman Affidavit ¶ 19.) However, there is a genuine dispute of fact as to whether Bregman *knew* that Scrivens was unauthorized to sign Morrell's name in this instance. (*See* Blasso Affidavit ¶ 5.) MRI does not dispute that Morrell generally allowed Scrivens to sign Morrell's name on his behalf, and that Bregman would notarize those signatures. (*Id.*; Bregman Affidavit ¶¶ 5-6; *see generally* Reply.) While the legal effect of such an arrangement is unclear,[23] a reasonable jury could conclude that Bregman believed he was authorized to notarize Scrivens's signature of

---

[23] At the time of the Valley Middle School Bid, Bregman was a registered notary public in the State of New Jersey. (Valley Middle School Bid at ECF p. 7.) In New Jersey, a notary public may notarize a document signed in a representative capacity. *See* N.J. Rev. Stat. § 52:7-10.1 (eff. 2021) ("In a representative capacity means acting as . . . [a]n authorized officer, agent, partner, trustee, or other representative for a person other than an individual; . . . or . . . [a]n authorized representative of another in any other capacity."). However, amendments to New Jersey law adopted in 2021 require that a notary's acknowledgement of a signature must note whether the signature was made in a representative capacity, *i.e.*, on someone else's behalf. N.J. Rev. Stat. §§ 52:7-10.12, 52:7-19 (eff. 2021). Bregman's notarization of the Valley Middle School Bid-related document does not note that Morrell's signature was made in a representative capacity. (*See* Valley Middle School Bid at ECF p. 7.) However, it is unclear whether New Jersey

Morrell's name on the Valley Middle School Project bid. As such, the court cannot conclude that Bregman "act[ed] adversely to his employer" in notarizing Morrell's forged signature. *Murray*, 102 N.Y. at 508.

Regarding Bregman's involvement with Emjack, it is undisputed that, in September of 2018, Morrell instructed Scrivens and Bregman to stop bids on behalf of MRI, and to instead focus on closing out existing MRI projects. (Scrivens Depo. 31:9-32:22; Bregman Affidavit ¶ 28.) For Scrivens and Bregman, this meant that their MRI-related work continued to dwindle until they were "basically . . . not working [for MRI] anymore." (Scrivens Depo. 128:1-23.) As such, in the fall of 2018, Bregman increased his work for and personal involvement with Emjack by: drafting a partnership agreement between himself, Scrivens, and Kiszko; listing his home address as Emjack's business address in Emjack's LLC Certificate of Formation; and receiving an Emjack-related correspondence at his MRI email address. (Pl.'s 56.1 ¶¶ 80, 82; Bregman's Response to Pl.'s 56.1 ¶¶ 80, 82; Emjack Draft Partnership Agreement; Emjack Certificate of Formation; October 2018 Email Exchange Between Scrivens, Bregman, and Tremco.) Despite this work on behalf of Emjack, in March of 2019, Bregman faithfully represented MRI in the Parsons Project bid, securing an offer from Jennings that Morrell ultimately refused. (*See* Bregman Affidavit ¶ 36; Pl.'s 56.1 ¶ 87.) It was only after Morrell's refusal that Bregman began working with Emjack on the Parsons Project. (*See* March 2019 Emails at ECF p. 3.) Finally,

---

law in effect at the time of the notarization (2020) required such a notation. In any event, the court notes that this mixed question of law and fact—whether this notarization arrangement was legally permissible and whether Bregman knew that Scrivens was unauthorized to sign on Morrell's behalf in this instance—will have to be resolved, likely by the court and before trial. For now, the court cannot conclude that there is no genuine dispute of material fact regarding Bregman's notarization of Morrell's forged signature.

in May of 2019, either after or close to Bregman's firing, Scrivens represented that either he or Bregman would supervise Emjack's work on the Bolan Project. (Scrivens Letter to CPL Architecture.)

Bregman's involvement with Emjack does not amount to faithless service. That an employee "during his employment planned and took preliminary steps to enter into a competitive business involve[s] no breach of fidelity so long as . . . [he] never lessened his work on behalf of [his employer] and never misappropriated to his own use any business secrets or special knowledge." *Feiger*, 41 N.Y. 2d at 929; *see Phansalkar*, 344 F.3d at 202 (characterizing *Feiger* as applying the *Murray* standard). Indeed, an employee "may [even] create a competing business prior to leaving his employer without breaching any fiduciary duty," so long as he does not "make[] improper use of the employer's time, facilities or proprietary secrets in doing so." *Schneider Leasing Plus v. Stallone*, 172 A.D.2d 739, 741 (2d Dep't 1991); *Ashland Mgmt. Inc. v. Altair Invs. NA, LLC*, 59 A.D.3d 97, 107 (1st Dep't 2008) (same). MRI does not allege that Bregman misappropriated any of its business secrets or special knowledge in working for Emjack. Moreover, the extent MRI claims that Bregman "performed work for Emjack during [MRI's] business hours," (Mot. at 7), the only evidence supporting that assertion are two emails from October 2018 and March 2019 in which Scrivens, during MRI's business hours, looped Bregman's MRI email address in on Emjack-related correspondence. (October 2018 Email Exchange Between Scrivens, Bregman, and Tremco; March 2019 Email Exchange Between Scrivens, Bregman, and Jennings.) This falls short of establishing an "improper use of [MRI's] time, facilities[,] or proprietary secrets." *Schneider Leasing Plus*, 172 A.D.2d at 741. Therefore, Bregman engaged in no disloyal behavior by "plann[ing[ and t[aking] preliminary steps" to work with Emjack. *Feiger*, 41 N.Y. 2d at 929.

Additionally, while "the taking of company property and the diversion of corporate opportunities [may] satisfy the faithless servant doctrine," there is no evidence of such behavior on the part of Bregman. *Altman Stage Lighting, Inc. v. Smith*, 20-CV-2575 (NSR), 2022 WL 374590, at *7 (S.D.N.Y. Feb. 8, 2022). MRI does not allege that Bregman stole company property. And while MRI claims that Scrivens and Bregman "divert[ed] the Parsons project away from [MRI]," (Mot. at 8), Bregman's affidavit, which the court may consider, paints a drastically different version of events. (Bregman Affidavit ¶¶ 36-37.) MRI does not dispute that Jennings initially awarded the Parsons Project *to MRI*, and that it only awarded the project to Emjack *after* Bregman withdrew MRI's bid at Morrell's command. (*Id.*) Moreover, there is no evidence that Bregman played any part in Emjack's initial bid on the Parsons Project, although he ultimately assisted Emjack with the Project after MRI refused the job. As such, the record does not demonstrate that Bregman stole company property or diverted corporate opportunities away from MRI.

While the faithless servant standard is somewhat amorphous, on this evidentiary record, the court concludes that MRI is not entitled to summary judgment on its faithless servant claim against Bregman. The *Murray* standard considers whether an employee "act[ed] adversely to his employer in any part of the transaction, or [neglected] to disclose any interest which would naturally influence his conduct in dealing with the subject of the employment." *Murray*, 102 N.Y. at 508. There is no evidence that Bregman acted adversely to MRI—to the contrary, he represented MRI faithfully in bidding on the Parsons Project. (Bregman Affidavit ¶¶ 36-37.) Nor was there any reason for Bregman to disclose his side work for Emjack, given that Scrivens and Bregman were essentially winding down their jobs at MRI and had been prohibited from bidding on additional projects on MRI's behalf, aside from the Parsons Project. (*Id.* ¶¶ 27-28; Scrivens

Depo. 128:1-23.) As such, MRI's motion for summary judgment on its fraudulent inducement claim against Bregman is denied.[24]

### b. Scrivens

MRI provides evidentiary support for several alleged acts of faithless service on the part of Scrivens, including that Scrivens: (1) performed work for FCI and Emjack during MRI's business hours and used MRI's New Jersey office to receive FCI and Emjack-related documents; (2) helped FCI bid on construction projects, in exchange for which FCI paid him several thousand dollars; (3) used MRI's DPMC certification and forged Morrell's signature on a document accompanying that certification in connection with FCI's bid for the Valley Middle School Project; (4) "helped" Emjack win the Parsons Project; (5) prepared Emjack's bid bond application for the Bolan Project, attended a site meeting during MRI's business hours, and agreed to supervise completion of Emjack's work on the Bolan Project alongside Bregman; and (6) entered into a contract with Marek, which had previously worked as a subcontractor for MRI, on behalf of Emjack. (*See* Mot. at 3-10.)

The court concludes that Scrivens rendered faithless service to MRI as of May 3, 2019, when he used MRI's DPMC certification and forged Morrell's signature on a document accompanying that

---

[24] Bregman argues that the court should not consider Scrivens's deposition in adjudicating MRI's motion for partial summary judgment. (Bregman Opp. at ECF pp. 4-7.) Specifically, Bregman points out that Scrivens's deposition was cut short after defense counsel realized the conflict in representing both Scrivens and Bregman. (*Id.* at ECF p. 5.) Thus, Bregman argues that he was effectively unrepresented at Scrivens's deposition, where he was unable to cross-examine Scrivens. (*Id.* at ECF pp. 5-6; *but see* Scrivens Deposition 37:10-12 (noting Bregman's presence at the virtual deposition).) The court need not address Bregman's argument because the court relies primarily on other record evidence—or the lack thereof—to deny MRI's motion for summary judgment as to Bregman.

certification in connection with FCI's bid for the Valley Middle School Project. The remaining factual allegations do not amount to faithless service.

There can be no genuine dispute that Scrivens "act[ed] adversely to his employer" with respect to the Valley Middle School Project. *Murray*, 102 N.Y. at 508. Scrivens submitted FCI's Valley Middle School Project bid in May of 2019, while he was still employed by MRI. (Valley Middle School Bid at ECF p.3; Scrivens Depo. 139:2-18.) While this conduct alone might not constitute a breach of Scrivens's duties of loyalty and good faith, Scrivens went further. The Valley Middle School Project required bidders to submit proof of their DPMC certification, *i.e.,* proof that the New Jersey Department of the Treasury had certified the bidder to engage in State construction projects. (Scrivens Depo. 138:23-139:18.) However, Scrivens attached *MRI's* DPMC certification to FCI's bid. (*Id.*; Valley Middle School Bid at ECF p. 8.) He also forged Brian Morrell's signature on a document accompanying the DPMC certification, which contained affirmations that "the amount of uncompleted work on contracts is $0," and "the amount of this bid proposal . . . does not exceed my prequalification dollar limit." (Valley Middle School Bid at ECF 7; Scrivens Depo. 139:11-18.) Scrivens did all of this without Morrell's knowledge or consent. (Scrivens Depo. 139:7-10.) Not only does this conduct likely amount to "the taking of company property," *i.e.,* MRI's DPMC certification, it also put Morrell and MRI on the hook for FCI's false representations to the State. *Altman Stage Lighting,* 2022 WL 374590, at *7. The court concludes that this conduct was adverse to MRI and thus constitutes faithless service.

However, the court cannot conclude that Scrivens "act[ed] adversely to his employer" with respect to the remaining transactions. *Murray,* 102 N.Y. at 508. First, although Scrivens helped FCI bid on construction projects, in exchange for which

FCI paid him several thousand dollars, such behavior was not adverse to MRI. It is undisputed that FCI never bid on the same project as MRI. Moreover, by the time Scrivens began preparing bids on behalf of FCI in late October 2018, Morrell had already instructed Scrivens and Bregman not to bid on any more jobs for MRI. Thus, it cannot be argued that Scrivens "diver[ted] . . . corporate opportunities" away from MRI. *Altman Stage Lighting*, 2022 WL 374590, at *7. Nor does MRI allege that Scrivens "[stole] company property," *id.*, or "misappropriated to his own use any business secrets or special knowledge [of MRI]" in submitting these bids on FCI's behalf, *Feiger*, 41 N.Y. 2d at 929. Therefore, the record reflects that Scrivens did not "act[] adversely to his employer" in preparing bids on behalf of FCI. *Murray*, 102 N.Y. at 508.

Likewise, while Scrivens "helped" Emjack win the Parsons Project, there is no evidence that such help was adverse to MRI. Specifically, it is undisputed that Jennings only awarded the Parsons Project to Emjack after Bregman withdrew MRI's bid at Morrell's command. Additionally, there is no evidence to suggest that Emjack and MRI submitted contemporaneous, competing bids to the Parsons Project. Rather, the current record could equally support the inference that Emjack did not bid on the job until after MRI withdrew its bid. (Scrivens Depo. 105:1-22; Bregman Affidavit ¶ 36.) Additionally, the fact that Scrivens corresponded with Jennings on behalf of Emjack regarding the scope of the Project and materials required does not indicate a breach of his duties of loyalty and good faith. Rather, Scrivens's conduct with respect to the Parsons Project indicates the sort of "plan[ing] and . . . preliminary steps to enter into a competitive business" in which employees are permitted to engage. *Feiger*, 41 N.Y. 2d at 929. And there is no indication that Scrivens "lessened his work on behalf of [MRI] [or] misappropriate[d] to his own use any business secrets or special knowledge" to complete this work on behalf of Emjack. *Id.*

The same reasoning applies to Scrivens's conduct with respect to the Bolan Project and Lukas Marek. There is no evidence that Scrivens, in securing Emjack's contracts for the Bolan Project and with Marek, "diver[ted] . . . corporate opportunities" away from MRI. *Altman Stage Lighting*, 2022 WL 374590, at *7. Indeed, Scrivens testified that by May 2019—when these transactions occurred—he "[was] basically . . . not working anymore for [MRI]. . . . [he] [was] just cleaning up and . . . closing out the building." (Scrivens Depo. 128:1-23.) Nor is there any indication that Scrivens "lessened his work on behalf of [MRI]" in facilitating these transactions. *Feiger*, 41 N.Y. 2d at 929. And MRI does not allege that Scrivens "[stole] company property," *Altman Stage Lighting*, 2022 WL 374590, at *7, or "misappropriated to his own use any business secrets or special knowledge [of MRI]" in working on the Bolan Project or with Marek, *Feiger*, 41 N.Y. 2d at 929. As such, the record reflects that Scrivens did not "act[] adversely to his employer" in working for Emjack. *Murray*, 102 N.Y. at 508.

Finally, while it is undisputed that Scrivens performed some work for FCI and Emjack during MRI's business hours, the extent of that work is unclear. Although Scrivens admitted to working for FCI and Emjack during MRI's business hours, he maintained that he performed such work during his lunch breaks. (Scrivens Depo. 82:6-20, 112:4-113:13.) Moreover, the only record evidence supporting MRI's assertion that Scrivens worked for FCI and Emjack during MRI's business hours are two short email chains from October 2018 and March 2019. (October 2018 Email Exchange Between Scrivens, Bregman, and Tremco (Scrivens forwarding Emjack-related email to Bregman at 9:16 A.M. on Monday, October 29, 2018); March 2019 Email Exchange Between Scrivens, Bregman, and Jennings (Scrivens emailing Bregman regarding Emjack's work on the Parsons Project at 11:48 A.M. on Thursday, March 28, 2019).) While an employee's use of his "employer's resources, time, facilities[,] or proprietary secrets" may constitute a breach of his duties of loyalty and good

faith, given that Scrivens conducted very little work for FCI and Emjack during MRI's business hours, and such work was not "adverse" to MRI, the court cannot conclude that such conduct constitutes faithless service. *Schneider Leasing Plus*, 172 A.D.2d at 741. Moreover, MRI cites no case, nor is the court aware of any, in which a court has held that the use of an employer's mailing address warrants disgorgement of the employee's compensation. Thus, while Scrivens may have performed some work for FCI and Emjack during MRI's business hours and used MRI's New Jersey office to receive FCI and Emjack-related documents, because the underlying work was not adverse to MRI and the extent of this work completed during MRI's business hours appears to have been minimal, the court concludes that such conduct does not amount to faithless service.

In sum, the court concludes that Scrivens "act[ed] adversely to [MRI]" and rendered faithless service as of May 3, 2019, the date of the Valley Middle School Project bid. *Murray*, 102 N.Y. at 508. Therefore, MRI's motion for summary judgment on its faithless servant claim against Scrivens is granted.

### C. Fraudulent Inducement

#### 1. Applicable Law

"To state a claim for fraudulent inducement under New York law, a plaintiff must allege: (1) a material misrepresentation or omission that induced the party to sign the contract; (2) scienter; (3) reliance; and (4) injury." *City Calibration Ctrs.*, 727 F. Supp. 3d at 361. Importantly, under New York Law, "a fraud claim may not be used as a means of restating what is, in substance, a claim for breach of contract." *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006). Rather, "[a] fraud claim is tenable only where the fraud alleged is 'collateral or extraneous to the contract.'" *FPP*, 764 F. App'x at 94 (quoting *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996)).

A fraud claim is "collateral" if "the contract, including its representations and warranties, does not address the factual bases of the fraud claim." *Id.* (citing *Wall*, 471 F.3d at 417).

### 2. Application

MRI alleges that Scrivens fraudulently induced MRI to enter into the Camp Smith Contract based on two material misrepresentations or omissions: (1) when Scrivens "falsely represented" that Emjack "had provided proof of contractually required insurance policies," including Worker's Compensation insurance; and (2) when Scrivens "falsely represented" that Emjack and EMTO "each provided him with Certified Payroll documents proving that it complied with the Subcontract and New York State Labor Law." (MRI's Am. Compl. ¶¶ 318-21.)

MRI does not discuss the first alleged misrepresentation in its motion for partial summary judgment. Instead, it focuses on the second alleged misrepresentation, arguing that Scrivens "fraudulently induced [it] into paying Emjack and EMTO for the Camp Smith project even though those entities did not comply with the terms of the contract regarding payment." (Mot. at 11.) Specifically, MRI asserts that the Camp Smith Contract "required that Emjack, and its successor, EMTO, submit payment requests pursuant to the express terms of the contract." (*Id.* at 12.) However, Scrivens "never required Emjack or EMTO to submit the documents required under the scope of the contract, and, instead, came to an agreement with the subcontractors on how much [] they would be paid." (*Id.*) Such an arrangement, MRI claims, "directly violates the terms and conditions of the written agreement." (*Id.*)

As to the first alleged misrepresentation, the court concludes that MRI abandoned this claim by failing to address it in its motion for partial summary judgment. *Jackson*, 766 F.3d at 196 ("Where abandonment by a counseled party is not explicit but such an inference may be fairly drawn from the papers and circumstances

viewed as a whole, district courts may conclude that abandon-ment was intended."). Additionally, even if it were not abandoned, MRI provides no evidentiary support for its allega-tion that Scrivens falsely represented Emjack and EMTO's insurance statuses. (Am. Compl. ¶¶ 318-19; *see generally* Pl.'s 56.1.) Moreover, to the extent MRI claims that Emjack and EMTO failed to provide proof of insurance policies *as required by the Camp Smith Contract,* such a claim sounds in breach of con-tract, not fraudulent inducement. *See Wall,* 471 F.3d at 416 ("[A] fraud claim may not be used as a means of restating what is, in substance, a claim for breach of contract."). As such, MRI is not entitled to summary judgment on its fraudulent inducement claim premised on the first alleged misrepresentation.

The second alleged misrepresentation fares no better. MRI makes no attempt to analyze the elements of a fraudulent inducement claim; rather, it simply asserts that Scrivens fraudulently induced it to enter into the Camp Smith Contract by allowing Emjack and EMTO to adopt payment procedures different than those pro-scribed in the Contract. MRI does not explain how conduct engaged in by Scrivens *after* the Camp Smith Contract was signed fraudulently induced MRI to sign the Contract. Moreover, MRI's own articulation of this claim demonstrates that it is, in sub-stance, a claim for breach of contract. (*See* Mot. at 12 (premising its fraudulent inducement claim on Emjack and EMTO's failure to comply with the Camp Smith Contract).) Because "a fraud claim may not be used as a means of restating what is, in sub-stance, a claim for breach of contract," MRI is not entitled to summary judgment on its fraudulent inducement claim premised on the second alleged misrepresentation. *Wall,* 471 F.3d at 416.

## IV. CONCLUSION

For the foregoing reasons, MRI's motion for partial summary judgment is DENIED as to its faithless servant claim against Breg-man, GRANTED as to its faithless servant claim against Scrivens,

and DENIED as to its fraudulent inducement claim against Scrivens. The court DEFERS DECISION on MRI's request for damages on its faithless servant claim against Scrivens pending a status conference and, if necessary, additional briefing on the issue. The parties are DIRECTED to confer and contact the Court's deputy to schedule a status conference, at which the parties should be prepared to discuss next steps. The Clerk of Court is respectfully DIRECTED to send a copy of this Memorandum and Order to Scrivens at his address of record.

SO ORDERED.

Dated:    Brooklyn, New York
          July 14, 2025

                                              s/Nicholas G. Garaufis
                                          NICHOLAS G. GARAUFIS
                                          United States District Judge